# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
## No. 21-0597V

|  |  |
|---|---|
| CYNTHIA CRIDER, | Chief Special Master Corcoran |
| Petitioner, | |
| v. | Filed: September 18, 2023 |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | |
| Respondent. | |

*Jimmy A. Zgheib, Zgheib Sayad, P.C., White Plains, NY, for Petitioner.*

*Andrew Henning, U.S. Department of Justice, Washington, DC, for Respondent.*

## RULING ON ENTITLEMENT[1]

On January 12, 2021, Cynthia Crider filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that she suffered a right-sided shoulder injury related to vaccine administration ("SIRVA") due to a vaccine she received on September 25, 2019. Petition (ECF No. 1). The case was assigned to the Special Processing Unit of the Office of Special Masters (the "SPU").

For the foregoing reasons, I find that Petitioner has put forth preponderant evidence that the at-issue shoulder injury had residual effects lasting for more than six months after vaccination; the injury's onset occurred within 48 hours after vaccination;

---

[1] Because this ruling contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755.  Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

and that there is no other condition or abnormality present that would explain the symptoms. Based on the lack of other objections from Respondent and an independent review of the evidence, Petitioner is therefore entitled to compensation for a Table SIRVA. I note however, that the limited and interrupted treatment course – despite the intervening Pandemic – would support a pain and suffering award along the lower end of the spectrum of such injuries. Petitioner should take into account this fact ruling, and make any necessary adjustments to her demand, although the parties are encouraged to pursue an informal resolution of damages.

## I.    Relevant Procedural History

Ms. Crider initially supported the Petition with some medical records and her sworn declarations. Exs. 1 – 7, ECF No. 5. The case was assigned to SPU in April 2022. Seven months later, Petitioner filed updated medical records as Ex. 6; reported that the evidence was complete; and conveyed a demand. ECF Nos. 14-16. But in September 2022, Respondent filed his Rule 4(c) Report recommending dismissal on the grounds that several Table elements could not be met. Rule 4(c) Report, ECF No. 25.

In October 2022, Petitioner was ordered to show cause why her claim should not be dismissed for the reasons identified by Respondent. Show Cause Order, ECF No. 26. In response, in December 2022, Petitioner filed outstanding and updated medical records; declarations from herself and two family members; and an email sent to her retained counsel approximately one-month post-vaccination. Exs. 8 – 15., ECF Nos. 27 – 29.[3] She concurrently filed a Motion for a Ruling on the Record regarding her eligibility and entitlement for a Table SIRVA claim, ECF No. 30 ("Brief"). Respondent maintained his objections to compensation in his Response filed February 28, 2023, ECF No. 33. Petitioner filed a Reply on March 9, 2023, ECF No. 34. The matter is ripe for adjudication.

## II.    Relevant Evidence

I have reviewed all of the evidence filed to date. I will only summarize or discuss evidence that directly pertains to the determinations herein, as informed by the parties' respective citations to the record and their arguments. Specifically:

---

[3] Exs. 3, 7, 12 – 14 are not affidavits, but declarations signed under penalty of perjury in accordance with 28 U.S.C.A. § 1746.

Petitioner was born in 1967. Her medical history included myasthenia gravis.[4] Two years prior to the subject vaccination, in September 2017, Petitioner presented to the Mena Regional Health System "("MRHS") emergency room to address pain in her right shoulder and back following a fall at home. Ex. 8 at 149. Imaging of the right shoulder and ribs were unremarkable. *Id.* at 145-46. She was discharged with a sling; instructions to heat, ice, and rest the shoulder; and a prescription for Motrin 800 mg. *Id.* at 149. Two days later, Petitioner's established primary care provider, Steven Forrest, M.D., at Mena Family Health Center (hereinafter the "PCP"), documented that she had fallen off the couch and caught herself with her right arm, precipitating the ER encounter. Ex. 4 at 41. On exam, the PCP observed "R[ight] shoulder ttp [tenderness to palpation] in rhomboid muscle. No ttp in the rtc [rotator cuff] or bursa." *Id.* at 42. He prescribed Norco and Baclofen for pain management. *Id.* at 41. A PT initial evaluation documented a "right shoulder rhomboid strain[5]" warranting eight formal sessions. Ex. 8 at 140-41. But Petitioner attended only four PT sessions. *Id.* at 130-37. The handwritten discharge summary, which is only partially legible, states: "Goals partially met." *Id.* at 137.

Subsequent encounters do not reflect any complaints related to Petitioner's right shoulder, right arm, or back. The last pre-vaccination medical encounters are from February 2019, when the PCP addressed pink eye and hypothyroidism. Ex. 4 at 12-16.

Several months later, on September 25, 2019, Petitioner received the subject flu vaccine in her right deltoid, at the Polk County, Arkansas, health unit. Ex. 2 at 2. Thereafter, the first contemporaneous documentation relevant to the injury is from twenty-nine (29) days post-vaccination, on October 24, 2019, when Petitioner submitted an inquiry on her future counsel's website. Ex. 15 at 1. She wrote:

> I got my flu shot 3 weeks ago I've taken one ever[y] year never had any pain this year at heart [sic? at all?] whenever they gave me the shot and I've been in pain eve[r] since then now it has spread down to my elbow and up to my shoulder I am going to go to the doctor tomorrow the walk in clinic told me that you do not get pain like this from a backs a nation [sic?

---

[4] Respondent provides that myasthenia gravis is "a chronic autoimmune, neuromuscular disease that causes weakness in the skeletal muscles that worsens after periods of activity and improves after periods of rest. These muscles are responsible for functions involving breathing and moving parts of the body, including the arms and legs." Response at n. 1, citing https://www.ninds.nih.gov/health-information/disorders/myasthenia-gravis (last accessed Aug. 31, 2023).

[5] "The rhomboid muscles are a group of muscles in your upper back. They're located on either side of your back, between your shoulder blades. They attach the edges of your shoulder blades to your spine." *Rhomboid Pain*, https://www.healthline.com/health/rhomboid-pain (last accessed Aug. 31, 2023).

vaccination?] when I googled the symptoms your website popped up im going to go see my primary tomorrow."

Ex. 15 at 1.[6]

The next day, October 25, 2019, Jennifer Kesterson, NP (hereinafter "the NP") at the Mena Walk-In Care Center (hereinafter the "walk-in clinic") recorded: "[Petitioner] states she fell off a step stool onto her rt shoulder about 3 weeks ago she states it's not getting better, shooting pain from her shoulder down her arm." Ex. 4 at 10. Petitioner reported that the pain was in the shoulder joint, moderate to severe, sharp upon movement and dull at all other times, and currently treated with Icy Hot, Aleve, and ibuprofen. *Id.* On exam, the shoulder's range of motion was "limited." *Id.* at 11. The NP recorded: "[Petitioner] does not want x-ray, she says just inflammation, discussed frozen shoulder, exercises." *Id.* at 8. The NP administered Decadron, Toradol, and Depomedrol injections into Petitioner's buttocks. *Id.* at 10. She discussed additional conservative measures to use until an upcoming appointment with the PCP. *Id.* at 10.

On November 13, 2019, the PCP recorded a wholly different explanation for Petitioner's pain (but also a reason why the earlier record did not address vaccination). It was now noted that "[Petitioner] received a flu shot from a student nurse at the health department and they gave it to her in the middle of her upper right arm. States she saw [the NP] in [the walk-in clinic], and [the NP] kept telling her, her pain was not from the shot, it was from a fall." Ex. 4 at 4. Petitioner reported that the injury "received flu shot in middle of upper arm with instant pain and has had pain since" – which pain was currently moderate, sharp with moderate decrease in activities of daily living, and radiating down to the elbow. *Id.* An exam found: "R arm TTP and palpable knot in distal deltoid. TTP deltoid and biceps muscles and tendons." *Id.* at 5. The PCP assessed: "Injection site reaction, subsequent encounter. Consider MRI shoulder due to deltoid and biceps tendonitis. Had steroid shot. Continue heat, NSAIDs, stretching exercises." *Id.* at 6. The PCP instructed Petitioner to follow up in six months. *Id.*

Also on November 13, 2019, the PCP made the following addendum to the October 25, 2019, walk-in clinic record: "[Petitioner] remembers that she did not have a fall[.] She had fell a month or so before and she hit her left hip and did not hurt her shoulder at that time. No other falls. She had a flu inj there in health dept and seems to be related to it. She had injections and is doing exercises as recommended and is improving. Steroid shot helped a lot." Ex. 4 at 11.

---

[6] *See also* Ex. 5 (retainer agreement signed by Petitioner on December 2, 2019, and by counsel on December 16, 2019).

That encounter was followed by a *ten-month gap* in any medical evaluation or treatment of the subject shoulder injury – punctuated by encounters for admittedly-unrelated issues. Specifically on February 19, 2020, Petitioner presented to the walk-in clinic to address recent dizziness, "head pressure," and high blood pressure. Ex. 4 at 65. Petitioner was concerned for a stroke, but she was assessed instead with hypertension. *Id.* At a February 28th follow-up, the PCP concurred, and prescribed new medications to address her hypertension. *Id.* at 59-62. Then on March 12th, Petitioner returned to the walk-in clinic for symptoms assessed as an upper respiratory infection. She disclaimed exposure to, and was not tested for, COVID-19. *Id.* at 57-58. For these three encounters, the medical records do not include any report or evaluation relating to the subject shoulder. *Id.* at 57 – 66.

After a further medical records gap, on September 23, 2020, Petitioner returned her PCP for a check up on various complaints including Graves' disease and hypothyroidism. Ex. 4 at 145. Additionally, she "still c/o [complained of] pain in her right arm after receiving the flu shot last year." *Id.* The evaluation did not particularly address the shoulder/arm, stating only: "Extremities: No clubbing. No cyanosis. No edema." *Id.* at 147. But the PCP assessed "right arm pain," and obtained an x-ray of the right humerus, which was "Ok. No calcific tendonitis." Ex. 4 at 121, 147-48. The PCP did not offer any treatment or follow-up specifically for this complaint – and none occurred, based on the ensuing medical records.

Medical records over roughly the next two years reflect that Petitioner sought care for various unrelated issues including hypothyroidism, sinus infection, COVID-19, a foster care parent physical, and several falls (without any indication of injury to her right shoulder/arm, however). *See generally* Ex. 6, 8, 11.

In her original declaration completed in January 2021, Petitioner recalled that her shoulder injury persisted for more than six months after vaccination; the injury, specifically pain, began "immediately after" vaccination; and she disclaimed any alternative cause for the injury. *See generally* Ex. 3.

In December 2022, Petitioner attested that the October 25, 2019, medical record was "neither complete nor accurate." Ex. 12 at ¶ 6. Petitioner recalls reporting that her right shoulder pain started right after her vaccination, but the NP did not believe a vaccine could cause such long-lasting pain and asked if Petitioner had experienced any other recent injuries. *Id.* at ¶ 5. Petitioner stated that she had fallen in her home laundry room six weeks prior to the vaccination and hurt her left hip, but not her right shoulder. *Id.* However, the NP "insisted that I must have hurt my shoulder in that fall." *Id.* Relevant to the severity requirement, Petitioner recalls being fearful of surgery and the Pandemic,

and thus electing for home exercises, Tylenol and ibuprofen, and application of an herbal massage lotion to self-manage her ongoing shoulder injury until returning to her PCP in September 2020. *Id.* at ¶¶ 6-10.

Also in December 2022, Petitioner's husband and son submitted declarations to the same effect. Exs. 13 – 14. Of particular note, her son (a certified first responder) recalled evaluating Petitioner following a fall in her home, resulting in minor left hip pain, a few weeks prior to the subject vaccination. Ex. 14 at ¶ 3. He recalls that this fall did not cause any injury to Petitioner's right shoulder, which instead began within a day after vaccination and persisted for at least six months thereafter. *Id.* at ¶¶ 3 – 5.

## III.   Ruling on Entitlement

### A.   Legal Standards

Before compensation can be awarded under the Vaccine Act, a petitioner must demonstrate, by a preponderance of evidence, all matters required under Section 11(c)(1), including the factual circumstances surrounding his claim. Section 13(a)(1)(A). In making this determination, the special master or court should consider the record as a whole. Section 13(a)(1). Petitioner's allegations must be supported by medical records or by medical opinion. *Id.*

To resolve factual issues, the special master must weigh the evidence presented, which may include contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Hum. Servs.,* 3 F.3d 415, 417 (Fed. Cir. 1993) (explaining that a special master must decide what weight to give evidence including oral testimony and contemporaneous medical records). Contemporaneous medical records are presumed to be accurate. *See Cucuras v. Sec'y of Health & Hum. Servs.,* 993 F.2d 1525, 1528 (Fed. Cir. 1993). To overcome the presumptive accuracy of medical records testimony, a petitioner may present testimony which is "consistent, clear, cogent, and compelling." *Sanchez v. Sec'y of Health & Hum. Servs.,* No. 11–685V, 2013 WL 1880825, at *3 (Fed. Cl. Spec. Mstr. Apr. 10, 2013) (citing *Blutstein v. Sec'y of Health & Hum. Servs.,* No. 90–2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)).

In addition to requirements concerning the vaccination received, the duration and severity of petitioner's injury, and the lack of other award or settlement,[7] a petitioner must

---

[7] In summary, a petitioner must establish that he received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception; suffered the residual effects of his injury for more than six months, died from his injury, or

establish that she suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination she received. Section 11(c)(1)(C).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of a flu vaccine. 42 C. F. R. § 100.3(a)(XIV)(B). The criteria establishing a SIRVA under the accompanying QAI are as follows:

Shoulder injury related to vaccine administration (SIRVA). SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis (even if the condition causing the neurological abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:

(i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;

(ii) Pain occurs within the specified time frame;

(iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

underwent a surgical intervention during an inpatient hospitalization; and has not filed a civil suit or collected an award or settlement for her injury. *See* Section 11(c)(1)(A)(B)(D)(E).

(iv) No other condition or abnormality is present that would explain the patient's symptoms (e.g., NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10) (2017).

### B.    Analysis

The first issue to be resolved is whether Petitioner has demonstrated residual effects of the alleged injury for more than six months after the September 25, 2019, vaccination. Section 11(c)(1)(D)(i). This is a threshold requirement for pursuing compensation under the Program. *Black v. Sec'y of Health & Hum. Servs.*, 33 Fed. Cl. 546, 550 (1995) (reasoning that the "potential petitioner" must not only make a *prima facie* case, but clear a jurisdictional threshold, by "submitting supporting documentation which reasonably demonstrates that a special master has jurisdiction to hear the merits of the case"), *aff'd*, 93 F.3d 781 (Fed. Cir. 1996) (internal citations omitted).

As noted above, Petitioner's active treatment course was limited to the October 25, 2019, walk-in clinic encounter featuring steroid injections and instruction on home exercises, followed by the November 13, 2019, PCP encounter which documented ongoing injury, and a plan to continue home exercises and follow up in six months.

Respondent avers that Petitioner has not provided a sufficiently credible and compelling explanation for the subsequent lack of follow-up. Response at 8. Notable are the intervening medical encounters on February 19, February 28, and March 12, 2020. These were not equivalent to "[a]n intervening medical encounter with *a specialist (whose practice is generally unrelated to the musculoskeletal system or pain management)*." Reply at n. 1 (citing *Dempsey v. Sec'y of Health & Hum Servs.*, No. 18-0970V, 2021 WL 1080563, at *4 (Fed. Cl. Spec. Mstr. Feb. 17, 2021)) (emphasis added). Instead, they were with general practitioners – who reasonably could have perceived, and/or documented Petitioner's own report, of a shoulder injury that was persisting at that time.

But the February and March 2020 encounters were focused on other acute concerns. I also credit that the Pandemic had by this time in 2020 escalated to the point that medical facilities and other public places were more significantly disrupted, and may reasonably have played a role in the postponement of the follow-up evaluation of Petitioner's shoulder, which had been planned for May 2020. The gap in medical encounters for *any other* concerns corroborates at least Petitioner's own concerns about COVID-19 exposure.

By September 2020, Petitioner followed up with her PCP on multiple concerns. As I previously noted: "[T]hat record establishes that [the PCP] *did not examine* the musculoskeletal system and the right shoulder. However, [the PCP's] acceptance of Petitioner's history of continued right shoulder injury since the vaccine, and his authorization of an x-ray, do constitute *some objective evidence* of ongoing sequelae – and there is no indication of an intervening alternative cause." Show Cause Order at 2 (emphasis added). I have also considered that Petitioner had a history of myasthenia gravis, resulting in periodic falls. But since the issuance of the Show Cause Order, Petitioner has ensured that the medical record evidence is complete – and that evidence does not reflect any falls or other trauma to the right shoulder occurring between November 2019 – September 2020, which would suggest an intervening cause for her renewed right shoulder complaints. I also recognize that two additional witnesses have provided sworn recollections that Petitioner's injury persisted for more than six months. Overall, the evidence preponderates in favor of Petitioner on the severity requirement, albeit weakly.

Respondent also argues that Petitioner's first post-vaccination medical encounter, with the NP at a walk-in clinic, seems to attribute the shoulder injury to a fall. Based on this record, Respondent avers that onset of Petitioner's shoulder pain did not occur within 48 hours post-vaccination, and that there is another condition or abnormality that would explain Petitioner's symptoms. Rule 4(c) Report at 6 – 7, citing 42 C.F.R. § 100.3(a)(XIV)(B); 42 C.F.R. § 100.3(c)(10)(ii, iv); *accord* Response at 9 – 10.

A relevant factual question is *when* the fall occurred. Importantly, there is no contemporaneous medical record documentation of it. Petitioner explains that she was only evaluated informally by her son, a certified first responder. I also recognize that the NP recorded that the fall was "about 3 weeks ago," which would be after the subject vaccination. In contrast, the PCP recorded that the fall was "a month or so before" seeing the NP, and thus before the vaccination. Petitioner and her son, who informally evaluated her for the fall, also endorse this latter timeframe. The record supports the conclusion that the fall occurred more likely than not before the vaccination.

Petitioner further disputes the overall reliability of the walk-in clinic record. In doing so, she has submitted additional non-medical, but equally contemporaneous evidence – her website submission describing right shoulder pain "ever since" vaccination. While this report was made to future counsel, it appears to have been unsolicited. It was also roughly contemporaneous to the injury at issue and focused on investigating the injury's cause

and/or liability thereof. It warrants *some* weight even though it is not a literal medical record substantiating the injury.[8]

The new contact form, the subsequent PCP record, and the fact witness declarations together support Petitioner's contention that the walk-in clinic's NP did not believe that a vaccine could cause the injury reported, sought an alternative explanation, and fixated on Petitioner's report of a recent fall instead.[9] And no other evidence supports that Petitioner's shoulder pain began with the acknowledged fall. Instead, her PCP recorded that the shoulder pain began "instant[ly]" upon the subject vaccination and had persisted in the weeks "since." Petitioner's new contact form and the fact witness declarations also support this onset determination. Based on these additional submissions, the evidence preponderates (again, somewhat weakly) in favor of finding no other condition or abnormality that would explain the symptoms at issue, and that Petitioner suffered the onset of shoulder pain within 48 hours after vaccination.

There is also sufficient evidence that Petitioner has satisfied the other QAI criteria. *See* 42 C.F.R. § 100.3(c)(10)(i), (iii). Respondent does not discuss any contributory medical history, or any symptoms extending beyond the shoulder. *See generally* Rule 4(c) Report; Response. And my own review of the record does not reveal preponderant evidence against these requirements.[10]

### C.   Other Requirements for Entitlement

**All other elements of a Table SIRVA claim have been preponderantly established.** Accordingly, Petitioner need not prove causation-in-fact. Section 11(c)(1)(C). However, she must satisfy the other requirements of Section 11(c) regarding the vaccination received, and the lack of other award or settlement. Section 11(c)(A), (B),

---

[8] However, Petitioner's report that the walk-in clinic had *already* disclaimed the potential of a vaccine injury, and that she was going to see "her primary" the next day – when in fact, her first encounter was at the walk-in clinic the next day, October 25, 2019 – is a contradiction left unexplained by her declarations and briefing.

[9] Indeed, approximately *two years earlier, in September 2017,* Petitioner had suffered a fall injuring her right shoulder – which resolved after one steroid injection and five PT sessions, based on the available evidence. That history may be further explanation for the confusion in the medical records created in 2019 (but there is not evidence that Petitioner had an ongoing shoulder injury throughout the intervening years, or that the prior history limits her to an off-Table significant aggravation claim).

[10] I note that the most significant treatment received for the injury alleged were Decadron, Toradol, and Depomedrol injections, administered into Petitioner's buttocks by the NP. These injections "helped a lot," according to the PCP approximately three weeks later. That choice of treatment seems atypical for an injury localized to the shoulder, fitting within the SIRVA criteria. Additionally, the medical record evidence does not include any imaging, which could have been useful to evaluate for trauma, inflammation, degenerative conditions, etc. But Respondent has not pressed these points – and I have accepted the explanation that the 2019 fall did not impact Petitioner's right shoulder.

and (D). Respondent does not dispute that Petitioner has satisfied these requirements in this case, and the overall record contains preponderant evidence which fulfills them.

### Conclusion and Scheduling Order

For the foregoing reasons, **I find that Petitioner has established entitlement and is thus entitled to compensation for a Table SIRVA.**

Thus, the case will now proceed to the damages phase. However, Petitioner must take note of the overall thin nature of the claim (which facially does not involve particularly intrusive or lengthy treatment) in calculating damages. This was clearly a very mild SIRVA, and one that Petitioner tolerated well enough via self-care to avoid professional medical assistance for lengthy periods of time. I am unlikely, given the nature of the facts, to accept Petitioner's contentions of ongoing shoulder pain, limitations, and dysfunction over three years post-vaccination. *See,* e.g., Ex. 12.

It appears that the previous demand is limited to some degree of pain and suffering, and unreimbursable expenses. *See* ECF Nos. 16, 18. If the parties cannot mutually identify grounds for settlement, however, they will need to formally brief their respective positions on damages, after which the matter *may* be considered for an expedited hearing depending on the undersigned's availability and consideration of overall case load.

**By no later than Friday, November 3, 2023, Petitioner shall file a joint status report updating on the parties' efforts towards an informal resolution of damages. The status report shall indicate whether Petitioner has made any adjustments to the demand previously submitted. If Petitioner's demand is ready for consideration, the status report shall indicate the date on which Respondent responded or intends to respond. If the parties have determined that informal resolution of damages is not possible, they shall jointly propose a briefing schedule. Any such briefing shall include comparison to prior reasoned opinions addressing the appropriate award for pain and suffering for Table SIRVA claims.**

**IT IS SO ORDERED.**

<u>s/Brian H. Corcoran</u>
Brian H. Corcoran
Chief Special Master